UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUSIE MAE CONNER,

                Petitioner,                     Case Number 07-10918
                                                 Honorable David M. Lawson

v.

MILLICENT WARREN,

                Respondent.
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

        The petitioner, Susie Mae Conner, a Michigan prisoner, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging her conviction of first-degree murder and sentence of life in prison without parole. A jury in Mecosta County, Michigan found the petitioner guilty of first-degree premeditated murder, Mich. Comp. Laws § 750.316(a), first-degree felony murder, Mich. Comp. Laws § 750.316(b), and one count of kidnapping, Mich. Comp. Laws § 750.349, as a result of the abduction and killing of Angela Hadrich. The trial judge merged the two murder convictions into a single first-degree murder conviction based on the alternative theories of premeditation and felony murder, and vacated the kidnapping conviction. The petitioner alleges that her conviction is unconstitutional because the jury heard testimony about statements made by the petitioner's non-testifying spouse in violation of the petitioner's Sixth Amendment rights, prosecutorial misconduct abridged her due process rights, and admission of certain improper evidence at trial resulted in violation of the petitioner's right to a fair trial. The respondent has filed an answer asserting that the petitioner is not entitled to habeas relief because the petitioner's claims are either procedurally defaulted or without merit. The Court finds no merit in the petitioner's claims and therefore will deny the petition.

Two fishermen found Angela Hadrich's body floating in the Muskegon River on November 26, 1998. Police recovered the body from the river on December 12, 1998. The death was ruled an accidental drowning and the case was closed. In January 2002, the petitioner's son, Bruce Conner, contacted the police to report that his mother and father, Susie and Tim Conner, were involved in Hadrich's death. As it turned out, Bruce was also involved in the events that led to Hadrich's death. Bruce gave several statements to the police and assisted authorities with their investigation by wearing a device to record conversations with the petitioner and Tim Conner. Prior to the petitioner's trial, both Bruce and Tim pleaded guilty to kidnapping Hadrich. The state dismissed open murder charges filed against both. The petitioner was charged with first-degree murder, felony-murder and kidnapping.

It appears that the reason Bruce waited for so long to contact police was his reluctance to expose himself to criminal liability. However, he finally decided to contact the authorities because Tim Conner and the petitioner were threatening him, his younger sister, and his fiancé. He believed his parents were having increasing difficulty living with the knowledge of their involvement in Hadrich's death.

At trial, Bruce testified that the petitioner became angry with Hadrich because Hadrich had stolen money or drugs from her. When Hadrich stopped by the Conners' house, the petitioner attacked Hadrich on the porch. The petitioner threatened to kill Hadrich and threatened to kill Tim and Bruce if they did not cooperate. The petitioner directed Bruce to get duct tape from the house, which was used to bind Hadrich's wrists and ankles. The petitioner then directed Bruce to get a heavy chain from the side of the house. When Bruce returned with the chain, Hadrich had been

moved to the bed of the petitioner's pickup truck. The petitioner directed Bruce to chain Hadrich to the truck to immobilize her. The petitioner had covered Hadrich's mouth and eyes with duct tape. The petitioner and Tim crushed up a large amount of Valium pills, mixed them with soda, and forced Hadrich to drink the concoction. The petitioner and Tim then drove away in the petitioner's truck with Hadrich in it.

The petitioner stated that she was going to "dump" Hadrich. At trial, Bruce testified on direct examination that Tim urged the petitioner to "just leave it be, leave it as a simple assault." Tr. Vol. III, p. 64. Tim accompanied the petitioner on the ride to persuade her to drop Hadrich off at the hospital or at her home and to dissuade the petitioner from following through on earlier threats to kill Hadrich. Bruce stayed at home with his younger sister.

Bruce testified that when Tim returned home later that night, Tim told Bruce that he did not realize how easy it was to break someone's neck. Tim also told Bruce that he and the petitioner threw Hadrich in the river near the Conners' old home and that together they drowned her. At a later point in time, Tim told Bruce that he and the petitioner threw Hadrich over a cliff that led to the river but that Hadrich did not make it down to the river so Tim and the petitioner had to roll Hadrich into the river and hold Hadrich's head under water because she kept bobbing above the water.

The state called Dr. Stephen Cohle, a forensic pathologist who performed the autopsy of Hadrich on December 14, 1998. He declared her cause of death to be asphyxia by drowning. Initially, he categorized the manner of her death as an accident. He testified that the anatomical findings in Hadrich's case would be identical whether the manner of death was accident or homicide, and the facts surrounding the death would determine how to categorize it. Subsequent to the autopsy, Dr. Cohle received additional information about the circumstances leading up to

Hadrich's death, which later came out at trial, causing him to re-categorize Hadrich's death as a homicide.

Dr. Cohle also testified that most adults will die from drowning after submersion in water for three to four minutes. The prosecutor asked Dr. Cohle whether he thought that three to four minutes was long enough to give a suspect time to think about what she is doing, to weigh the pros and cons of her actions, and to re-think and reflect upon her decision. Dr. Cohle answered yes. At no time during the course of Dr. Cohle's testimony did the defense counsel lodge any objections.

As its last witness, the state called Troy Ernst, a forensic scientist with the Michigan State Police who was qualified as an expert in microchemical analysis. Tr. Vol. VII, pp. 4-5. Ernst testified that he tested the clothing Hadrich was wearing when her body was recovered. In October 2002, he found duct tape on one of the victim's socks. During trial, Ernst learned that the state believed he had performed a microscopic examination of all of the clothing during the analysis he performed in October 2002 when in fact he had not. As a result of this misunderstanding, the state asked Ernst to examine the victim's clothing microscopically. This examination took place the week before Ernst testified at trial. Ernst located adhesive residue on the sleeve of the victim's jacket; the residue was consistent with the infrared spectroscopy of the duct tape found previously on the victim's sock. The petitioner moved to exclude the evidence of the results of this microscopic examination because it was discovered so late in the proceedings. The trial court denied the motion.

The jury convicted the petitioner of first-degree premeditated murder, felony murder and kidnapping. In compliance with double jeopardy protections, the state trial court consolidated the two murder convictions into one count of first-degree murder under alternative theories of

premeditation and felony murder, and vacated the kidnapping conviction. The petitioner's conviction and sentence were affirmed on direct appeal to the Michigan Court of Appeals, *People v. Conner*, No. 253179, 2005 WL 562806 (Mich. Ct. App. Mar. 10, 2005), and the Michigan Supreme Court denied her application for leave to appeal, *People v. Conner*, 474 Mich. 933, 706 N.W.2d 18 (2005).

The petitioner timely filed her habeas petition raising the following claims, all of which had been presented to the state appellate courts:

I. Whether the petitioner's Confrontation Clause rights were violated when her son testified about statements made by her ex-husband and non-testifying co-defendant.

II. Whether the prosecutor engaged in misconduct resulting in the denial of the petitioner's right to a fair trial when he elicited testimony from the state's expert witness that was outside the area of his expertise.

III. Was it error for the trial court to admit evidence of adhesive residue on the victim's jacket where a proper chain of evidence could not be established and where it was discovered so late in the proceedings that it resulted in the denial of the petitioner's right to a fair trial.

Habeas Pet. at 11.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the great writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)&(2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .

> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

[A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .

[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409-11; *see also Knowles v. Mirzayance*, __ U.S. __, __, 129 S. Ct. 1411, 1419 (2009) (noting that the Supreme "Court has held on numerous occasions that it is not ""'an unreasonable application of clearly established Federal law'"" for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc).

## A.

The petitioner challenges the admission of Bruce Conner's testimony about Tim Conner's statements to Bruce. The statements fall into two categories. First, Bruce testified about statements that Tim made to him while Bruce was wearing a wire and serving as a police informant. Second, Bruce testified about statements Tim made to Bruce immediately following the murder. Tim's statements in both categories implicated Tim and the petitioner in the drowning death of Hadrich. The petitioner asserts that her Confrontation Clause rights were violated by the admission of Bruce's testimony.

The Michigan Court of Appeals found that the petitioner waived her Sixth Amendment Confrontation Clause rights because the testimony describing her former husband Tim's statements was elicited by her own attorney's questioning. That court held:

> In the present case, the prosecutor called defendant's son and elicited testimony from him regarding the events just before defendant and his father left with the victim in the back of defendant's truck. Defendant's son testified that his father said, "Just leave it be, it's a simple assault, take her to the hospital, drop her off, take her to her mother's house, leave her at her ma's house, she can make up whatever story she wants to make up as far as how she got drugged and got beat up, whatever, just leave it as is." This statement does not directly implicate defendant in the victim's murder, but rather only suggests that defendant participated in an assault on the victim, which defendant's son already testified to witnessing. Furthermore, it is clear from the prosecution's later questioning that the testimony was elicited to explain a possible inconsistency in defendant's son's statements to the police where he indicated that his father may have participated in the assault on the victim. Aside from this statement, the prosecutor did not elicit hearsay statements by defendant's former husband through her son's testimony on direct examination. On the contrary, it was defendant's own trial counsel who elicited the hearsay testimony on cross-examination of defendant's son, to which the prosecutor responded on redirect, and which she now claims prejudiced her trial.
>
> However, defendant argues that she had no choice but to delve into the hearsay to react to the testimony elicited by the prosecutor from her son on direct examination. She contends that the testimony by her son that he recorded conversations with her former husband regarding the events of that night coupled with testimony concerning her reactions to some of those conversations forced her to explore the substance of the hearsay statements on cross-examination to point out inconsistencies with the physical evidence. We find no merit to this argument. The prosecutor had the right to elicit relevant testimony from defendant's son regarding his cooperation with the police and defendant's reactions to conversations about the events of that night. Nothing in that testimony constituted a hearsay statement by defendant's former husband implicating defendant's Sixth Amendment rights or otherwise compelling her to address her former husband's statements. The hearsay statements by defendant's former husband, other than the assault statements, were brought out by defendant on cross-examination of her son and by the prosecutor in response to defendant's cross-examination. Defendant cannot deliberately bring out that testimony in the hope that the inconsistencies will benefit her while harboring error as an appellate parachute. [*People v.* Carter, 462 Mich. 206, 214, 612 N.W.2d 144, 148-49 (2000)].

By electing to cross-examine her son regarding her former husband's statements, knowing that those statements implicated her in the murder, defendant waived her Confrontation Clause rights. [*People v.*] *Riley*, [465 Mich. 442, 448-49, 636 N.W.2d 514, 517-18 (2001)]. Consequently, any error was extinguished.

*Conner*, 2005 WL 562806, at *1-2.

The Michigan Court of Appeals disposed of the Confrontation Clause issue on the basis of waiver. However, the Sixth Circuit has held that a defendant's action in opening the door to the admission of a testimonial out-of-court statement that violates the right of confrontation is insufficient to excuse the violation. *United States v. Cromer*, 389 F.3d 662, 679 (6th Cir. 2004) ("[T]he mere fact that Cromer may have opened the door to the testimonial, out-of-court statement that violated his confrontation right is not sufficient to erase that violation."). Because the state court did not discuss the application of Supreme Court Confrontation Clause precedent, this Court must look to the result of the state court's ruling and examine it under the "contrary to" provision of 28 U.S.C. § 2254(d). *Bugh v. Mitchell,* 329 F.3d 496, 508 (6th Cir. 2003) (citing *Thompson v. Bell*, 315 F.3d 566, 585 (6th Cir. 2003)).

As a preliminary matter, the respondent argues that the petitioner procedurally defaulted this claim because she did not object at trial to the testimony she challenges now. "[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525; *cf.* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure

of the applicant to exhaust the remedies available in the courts of the State.")  In this case, the Court

finds that the interests of judicial economy are best served by addressing the merits of this claim.

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions,

the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const.

amend. VI.  "[T]he Sixth Amendment's right of an accused to confront the witnesses against him

is . . . a fundamental right and is made obligatory on the States by the Fourteenth Amendment."

*Pointer v. Texas*, 380 U.S. 400, 403 (1965).  The Confrontation Clause promotes reliability in

criminal trials by providing defendants the opportunity for cross-examination.  *Kentucky v. Stincer*,

482 U.S. 730, 739 (1987); *see also Stevens v. Bordenkircher*, 746 F.2d 342, 346 (6th Cir. 1984).

The rights of confrontation and cross-examination "have ancient roots" which the "Court has been

zealous to protect . . . from erosion."  *Pointer*, 380 U.S. at 404-05 (quoting *Greene v. McElroy*, 360

U.S. 474, 496-97 (1959)).  Cross-examination has been described as "the greatest legal engine ever

invented for the discovery of truth."  *California v. Greene*, 399 U.S. 149, 158 (1970) (citation and

internal quotations omitted).  However, the Sixth Circuit has held consistently that although

cross-examination is necessary to the preservation of an accused's rights under the Confrontation

Clause, the right to cross-examine is not limitless.  *Stewart v. Wolfenbarger*, 468 F.3d 338, 347 (6th

Cir. 2006).

The Confrontation Clause bars the admission of testimonial statements made by "witnesses"

out of court unless the declarant is unavailable to testify and the accused has had a prior opportunity

to cross-examine the witness.  *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004).  The Supreme

Court has held that the term "witnesses" does not encompass all hearsay declarants, but only those

who "bear testimony."  *Id.* at 51.  Subsequent to *Crawford*, the Supreme Court made clear that the

Confrontation Clause applies only to out-of-court statements that are testimonial in nature. *Whorton v. Bockting,* 549 U.S. 406, 420 (2007) (explaining that, under *Crawford,* the Confrontation Clause has no application to non-testimonial out-of-court statements even if unreliable); *Davis v. Washington*, 547 U.S. 813, 821 (2006) ("It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.").

Whether the Confrontation Clause is implicated turns on whether Tim Conner's out-of-court statements to Bruce Conner were "testimonial" within the meaning of *Crawford.* The *Crawford* court did not define the term but it "provided examples of those statements at the core of the definition, including prior testimony at a preliminary hearing, previous trial, or grand jury proceeding, as well as responses made during police interrogations." *United States v. Saget*, 377 F.3d 223, 228 (2d Cir. 2004). The Sixth Circuit has defined "testimonial" statements as those "made in circumstances in which a reasonable person would realize that it likely would be used in investigation or prosecution of a crime." *Cromer*, 389 F.3d at 673-74 (adopting the definition proposed in Richard D. Friedman & Bridge McCormack, *Dial-In Testimony*, 150 U. Pa. L. Rev. 1171, 1240-41 (2002)).

In this case, Tim Conner – the declarant – made statements to his son. Some of the statements were recorded by Bruce when he was serving as an informant, but it is undisputed that Tim did not know Bruce was wearing a recording device. In both situations, whether or not Bruce was wearing a wire, Tim made statements to his son and did not realize or anticipate they would be used in an investigation or prosecution. It is more likely that he assumed the opposite since the family committed the crime together and hoped to cover it up. Such statements are non-testimonial

in nature. *Saget*, 377 F.3d at 229 (statements made by declarant to someone working as confidential informant whose status was unknown to declarant were non-testimonial) (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)); *Desai v. Booker*, 538 F.3d 424, 427 (6th Cir. 2008) (statements made to friends not testimonial); *United States v. Franklin*, 415 F.3d 537, 545-46 (6th Cir. 2005) (same) (citing with approval *United States v. Lee*, 374 F.3d 637, 644-45 (8th Cir. 2004) (statements made to mother not testimonial)); *cf. United States v. Martinez*, 430 F.3d 317, 328-29 (6th Cir. 2007) (statements made to co-conspirator in furtherance of conspiracy not testimonial).

Because the statements at issue were non-testimonial, the Confrontation Clause is not implicated and no Sixth Amendment violation occurred. The state court decision was based upon a reasonable determination of the facts in light of the evidence presented, and was consistent with Supreme Court precedent. The petitioner is therefore not entitled to habeas relief on this claim.

## B.

In her next claim, the petitioner argues that the prosecutor engaged in misconduct so egregious that it rendered her trial fundamentally unfair. The alleged misconduct consisted of questions posed to Dr. Stephen Cohle, the physician who performed the autopsy, concerning the manner of death. Cohle testified in response to the prosecutor's questions that he changed his opinion on the manner of Hadrich's death from accident to homicide after he received additional information, which included the threats made by the petitioner, the kidnaping, the Valium, the victim being thrown over a cliff and into the river and held under water, and the fact her body was found near the former home of the suspects. Cohle was allowed to explain that the location of the body was significant because he learned from behavioral scientists at the FBI that killers will frequently dispose of a body in areas with which they are familiar. Cohle also testified that the length of time

required for death by drowning was sufficient to allow an assailant to premeditate and deliberate her actions.

The respondent contends that this claim is procedurally defaulted because the petitioner did not object at trial to the prosecutor's questions she now challenges. Because the petitioner failed to object at trial, the Michigan Court of Appeals reviewed the claim for plain error. As explained above, a federal court may decide to address the merits of a habeas claim instead of deciding a procedural default issue. *Hudson*, 351 F.3d at 215. In this case, the Court finds that the interests of judicial economy are best served by addressing the merits of this claim. *See Lambrix,* 520 U.S. at 525.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Prosecutorial misconduct will form the basis for a new trial and habeas relief only if the alleged misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "To constitute a denial of due process, the misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *Byrd v. Collins*, 209 F.3d 486, 529-30 (6th Cir. 2000) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)). The Court first determines whether the prosecutor's conduct or remarks were improper. *Slagle v. Bagley*, 457 F.3d 501, 515-16 (6th Cir. 2006). If they were, then the Court decides whether the trial was fundamentally unfair "by evaluating the totality of the circumstances surrounding each individual case," *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982), considering four factors: "(1) the likelihood that the remarks would mislead the jury or prejudice the accused, (2) whether the

remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial." *Bowling*, 344 F.3d at 512-13. The court must focus on "'the fairness of the trial, not the culpability of the prosecutor.'" *Pritchett*, 117 F.3d at 964 (quoting *Serra v. Mich. Dep't of Corrs.*, 4 F.3d 1348, 1355 (6th Cir. 1993)).

The petitioner challenges two questions posed to Dr. Cohle by the prosecutor. The first concerned the significance of the fact that Hadrich's body had been found near the petitioner's former residence. The second asked whether the petitioner had enough time to deliberate and reflect before she killed Hadrich. Although the Michigan Court of Appeals analyzed these claims under the plain error standard, the decision is very thorough and constitutes a reasoned adjudication on the merits within the meaning of 28 U.S.C. § 2254(d). This Court therefore reviews the decision under AEDPA's deferential standard of review. *Fleming v. Metrish,* 556 F.3d 520, 531-32 (6th Cir. 2009); *compare with Benge v. Johnson*, 474 F.3d 236, 246-47 (6th Cir. 2007) (where state court's plain error review did not amount to adjudication on the merits federal habeas court employs *de novo* review) and *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003) (same).

The Michigan Court of Appeals found the first challenged statement to be proper and the second to be improper but nevertheless concluded that the error was harmless:

> At trial, the prosecutor called a pathologist, who was qualified as an expert, to testify regarding the method of the victim's death. The pathologist testified that he looked to the history surrounding how the death occurred or how the body was found, and that this played a role in making a finding as to the person's method of death. Further, the expert testified that knowing that defendant had lived in the area where the victim's body was found made it more likely, in his opinion, that the method of death was homicide. He explained that this was based on specialized knowledge of common body disposal patterns that he acquired from professional lectures he had attended. Therefore, under these circumstances, the testimony was within his area of specialized knowledge and was admissible pursuant to MRE 702.

Accordingly, this evidence was properly admissible and the prosecutor did not commit misconduct by eliciting it.

Such was not the case, however, with regard to the testimony regarding premeditation. The function of an expert is to supply expert testimony in the form of an opinion, which may embrace an ultimate issue of fact. *Carson Fisher Potts & Hyman v Hyman*, 220 Mich App 116, 122; 559 NW2d 54 (1996); MRE 704. However, an expert witness may not tell the jury how to decide the case. *Hyman, supra* at 122-123. "Therefore, it is error to permit a witness to give the witness'[s] own opinion or interpretation of the facts because doing so would invade the province of the jury." *Id.* at 123. Consequently, permitting the prosecution's expert to interpret his own testimony regarding the amount of time that it takes to drown someone and opine that . . . this amount of time was sufficient to premeditate . . . was clear error. Premeditation is an essential element of first-degree premeditated murder, *see People v Ortiz*, 249 Mich App 297, 301; 642 NW2d 417 (2002), and should have been left to the jury alone to decide.

However, at trial, the jury heard overwhelming evidence that defendant deliberately and premeditatedly killed the victim. The jury heard testimony from defendant's own son that she became angry with the victim when the victim failed to obtain the marijuana she had wanted. Defendant's son testified that defendant repeatedly threatened to kill the victim after she became angry and that, throughout the ordeal, the victim was pleading for her life. Defendant's son went on to describe in vivid detail how defendant ordered him to assist her in binding, drugging, and chaining the victim in the back of defendant's truck. On cross-examination, defendant's son further testified that when defendant and his father returned, his father said that both he and defendant had to hold the victim down because she kept bobbing up in the water.

In light of this devastating testimony and the substantial amount of circumstantial evidence introduced against defendant in this case, we conclude that the error committed by the introduction of the pathologist's opinion regarding premeditation could not have affected the outcome of the trial. *See McLaughlin, supra* at 645. Moreover, even if we could so conclude, we see no basis to support a finding that the error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity or public reputation of the judicial proceedings. Therefore, there was no plain error warranting reversal.

*Conner*, 2005 WL 562806, at *2-3 (footnote omitted).

The Michigan Court of Appeals concluded that the first challenged question regarding body disposal patterns did not exceed the bounds of Dr. Cohle's expertise and the testimony was admissible under Mich. R. Evid. 702. That conclusion is dubious, since Dr. Cohle, a forensic

pathologist, was not an expert on the behavior of killers or the disposal of bodies; he merely regurgitated information he had acquired from actual experts in the field. Nonetheless, it is not the function of this Court to second-guess the state court's evidentiary rulings unless they cause the trial to be fundamentally unfair. The state court of appeals found the testimony to be proper. Since reasonable jurists differ on that point, it can hardly be said that the prosecutor committed misconduct by eliciting that testimony. Because the first question to Dr. Cohle was not designed intentionally to elicit inadmissible testimony under Michigan law, the question was not improper and did not constitute prosecutorial misconduct. *Slagle,* 457 F.3d at 517 (state court determination that prosecutor's inquiry was permissible under state law renders challenged inquiry proper for purposes of prosecutorial misconduct claim).

The state appellate court found the second challenged question to be improper because it asked Dr. Cohle to opine on premeditation, an essential element of first-degree premeditated murder, and Dr. Cohle's answer invaded the province of the jury. Although the improper question was deliberate, it was isolated. Further, the evidence in this case against the petitioner was overwhelming. The evidence was so strong that any error or prejudice inflicted by Dr. Cohle's improper testimony was harmless and could not have affected the outcome of the trial. *See Gillard v. Mitchell*, 445 F.3d 883, 897-98 (6th Cir. 2006); *see also Slagle*, 457 F.3d at 527 ("Overwhelming evidence of guilt can oftentimes be sufficient to sustain a conviction despite some prosecutorial misconduct.") (internal quotation marks and citation omitted). The prosecutor's questioning did not undermine the trial's fundamental fairness. In so concluding, the state court did not violate or unreasonably apply federal law. The petitioner is not entitled to habeas relief on this claim.

C.

-16-

In her final claim, the petitioner asserts that the admission of evidence discovered late in the proceedings violated her right to a fair trial. Defense counsel filed a motion to exclude the evidence of tape residue on Hadrich's jacket based on the results of Troy Ernst's testing. Defense counsel argued that the prosecutor violated discovery rules and failed to establish a proper chain of custody for the jacket, and the late disclosure prejudiced her because it precluded her from fully cross-examining her son – the state's main witness – who testified prior to the admission of the tape residue evidence, and from revising her trial strategy. The court denied the motion but ordered the continuance of the trial until the defense could have independent testing done at state expense. After completion of independent testing, which confirmed the results of Ernst's testing, the trial court admitted the prosecution's evidence. The state courts found no merit to the claim that the prosecutor violated the rules of discovery and concluded that the chain of custody issues did not require the exclusion of the evidence and that the ability to perform independent testing cured any prejudice suffered by the defense.

"Habeas review does not encompass state court rulings on the admission of evidence unless there is a constitutional violation." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994). Only "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512. The category of cases in which evidentiary rulings have been held to violate fundamental fairness is extremely narrow. *Ibid.* (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)). The Michigan Court of Appeals rejected the petitioner's arguments and upheld the trial court's evidentiary ruling:

> Defendant next argues that the trial court abused its discretion when it permitted the prosecution to introduce testimony regarding new physical evidence found by testing done during the course of the trial. We disagree.

The decision whether to admit evidence is within the discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion. *People v Starr*, 457 Mich 490, 494; 577 NW2d 673 (1998). An abuse of discretion is found only if an unprejudiced person, considering the facts on which the trial court acted, would say that there was no justification or excuse for the ruling made, *People v Snider*, 239 Mich App 393, 419; 608 NW2d 502 (2000), or the result is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias, *People v Hine,* 467 Mich 242, 250; 650 NW2d 659 (2002), quoting *Dep't of Transportation v Randolph,* 461 Mich 757, 768; 610 NW2d 893 (2000). Even if an evidentiary error occurred, it will not merit reversal in a criminal case unless, after an examination of the entire case, it affirmatively appears that it is more probable than not that the error was outcome determinative. *People v Lukity,* 460 Mich 484, 495-496; 596 NW2d 607 (1999).

Defendant first argues that the prosecutor violated the rules of discovery by only informing defendant of the new evidence during the trial itself. However, defendant has not provided any evidence to support a finding that the prosecutor violated the rules of discovery. Defendant bears the burden of furnishing this Court with a record to verify the factual basis of any argument upon which reversal is predicated. *People v Elston,* 462 Mich 751, 762; 614 NW2d 595 (2000). In the absence of any evidence to support the conclusion that the prosecutor violated the rules of discovery in connection with the new evidence, we find this argument to be without merit.

Defendant next argues that the trial court violated her right to a fair trial by introducing the newly discovered evidence. The crux of this argument is that, because the evidence was discovered so late in the trial process, introduction of the new evidence had the result of preventing defendant from effectively cross-examining her son, the primary witness against her, because the new evidence was discovered after that witness had already testified. Further, defendant argues that, had she known of this evidence before trial, her entire trial strategy would have been different.

First, although defendant cross-examined this witness extensively over two days of trial, amounting to nearly two hundred pages of transcript, defendant did not question him about the lack of evidence of duct tape on the victim's clothing. The only questioning even remotely related to the scientific findings was when defendant elicited testimony from him that he only remembered wrapping the tape around the victim's skin itself and not her clothing. Yet, the newly discovered evidence concerned additional findings consistent with duct tape on the victim's coat. Given that defendant did not emphasize the lack of evidence of duct tape on the victim's clothing in cross-examining this witness, we find that defendant has not demonstrated that she was denied the ability to effectively cross-examine this witness by the late discovery of the new evidence. Moreover, defendant has not

demonstrated how her trial strategy would have been different had the newly discovered evidence been available before trial and how it might have altered its outcome. Accordingly, defendant has failed to demonstrate that the admission of the evidence was error warranting reversal.

Finally, defendant argues that the court abused its discretion when it admitted the new evidence because this evidence was obtained from the victim's clothing and the prosecution had failed to establish a proper chain of custody for this clothing. We disagree. This Court has held that the admission of real evidence does not require a perfect chain of custody. *People v White,* 208 Mich App 126, 130; 527 NW2d 34 (1994). "Any deficiency in the chain of custody goes to the weight of the evidence rather than its admissibility once the proffered evidence is shown to a reasonable degree of certainty to be what its proponent claims." *Id.* at 130-131. In the present case, the prosecutor presented sufficient evidence that the clothing was that taken from the victim's body. Accordingly, the newly discovered evidence was not excludable on the ground that the chain of custody was incomplete.

*Conner*, 2005 WL 562806, at *3-4.

To the extent that the petitioner's argument in this Court is based upon state law, it fails to state a claim upon which habeas relief can be granted. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). It is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A federal court is limited on federal habeas review to deciding whether a state court conviction violates the Constitution, laws, or treaties of the United States. *Ibid.* Further, as the state courts concluded, there is no merit to the claim that the prosecutor violated a rule of discovery, and the chain of custody argument goes to the weight of the evidence, not to its admissibility.

As noted by the Michigan Court of Appeals, the heart of the petitioner's argument is that she was prejudiced in her ability to plan her defense strategy and in her ability to cross-examine her son because the new evidence was admitted after he testified. "Whether the admission of prejudicial evidence constitutes a denial of fundamental fairness turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor." *Brown v. O'Dea,* 227 F.3d 642, 645 (6th

Cir. 2000) (quoting *Leverett v. Spears*, 877 F.2d 921, 925 (11th Cir. 1989)) (internal quotation marks omitted).  If a federal habeas court is left with "grave doubt" whether the erroneous admission of evidence had "a substantial and injurious effect or influence in determining the jury's verdict" then "the petitioner must win."  *O'Neal v. McAninch*, 513 U.S. 432, 434, 445 (1995).  When considered in the context of the wide- ranging and devastating testimony of Bruce Conner, the added evidence of tape residue on Hadrich's jacket is secondary at best and far from a "crucial, critical highly significant factor."  Bruce testified that the victim had been duct taped and that he only duct taped her skin.  The new evidence was cumulative to the evidence of duct tape on the victim's sock, which was previously admitted.  Defense counsel did not point out the inconsistency between Bruce's testimony that he only duct taped the skin and the evidence of duct tape on the sock.  The newly discovered "jacket" evidence was indistinguishable from the "sock" evidence, and the petitioner may not argue it significantly would have altered her cross-examination approach.  The same is true of the petitioner's trial strategy of attacking Bruce's credibility.  The petitioner fails to explain how her trial strategy would have differed, had the newly discovered evidence been available before trial.

Finally, the state trial judge's disposition of this issue accounted for the lateness of the discovery and the defendant's interest in dealing with the new revelation.  The trial judge provided the defense an opportunity to examine and test the evidence, authorized an expert at state expense, and allowed liberal cross-examination of the expert.  It is difficult to see what the defense might have done differently even if the duct-tape residue had been discovered and disclosed well in advance of trial.

The state court decisions on this issue did not involve an unreasonable application of Supreme Court precedent.  The petitioner is not entitled to habeas relief on this claim.

III.

For the reasons stated, the Court concludes that the petitioner is not entitled to federal habeas relief on the claims contained in her petition.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: March 24, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 24, 2010.

s/Teresa Scott-Feijoo
TERESA SCOTT-FEIJOO